Gerald Singleton, SBN 208783
Kimberly S. Hutchison, SBN 288682
Andrew Bluth, SBN 232387
Chris Rodriguez, SBN 212274
SINGLETON SCHREIBER, LLP
591 Camino De La Reina, Ste 1025
San Diego, CA 92108
Telephone: (619) 771-3473
Fax: (619) 255-1515
Email: gsingleton@singletonschreiber.com
         khutchison@singletonschreiber.com
         abluth@singletonschreiber.com
         crodriguez@singletonschreiber.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.M. and C.L.V.*, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity;; SIRCE E. OWEN, Acting Director of EOIR; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego; SIDNEY AKI, Director of Field Operations, San Diego Field Office | Case No.: '25CV2308 AGS AHG<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |

1

U.S. Customs and Border Protection;
GREGORY J. ARCHAMBEAULT,
Director of U.S. Immigration and
Custom Enforcement and Removal
Operations (ERO), San Diego; DOES 1
through 20,

Defendants.

*Individual Plaintiffs have concurrently filed a motion to proceed under pseudonyms.

## INTRODUCTION

1.    This case challenges Defendants' practice of arresting people who are present at immigration court to attend scheduled hearings before immigration judges. This practice targets people who are trying to follow all legal requirements to seek safety and protection in the United States. Under the last Trump Administration, a similar practice was employed in San Diego and subsequently enjoined. Now, Plaintiff in this case asks this Court to end this practice with respect to a specific class of individuals who are affected: people seeking asylum who are attending mandatory hearings before immigration judges in the San Diego Immigration Court while not detained, who were previously granted release from the custody of the Department of Homeland Security and for whom there have been no individual changed circumstances with respect to their flight risk or risk of danger to the community since their initial release determination.

2.    The United States is legally obligated to provide protection to those who qualify as refugees under both U.S. immigration law and international law. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) ("If one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 [Refugee] Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968."). Asylum is one form of protection that is available

for someone who comes to the United States seeking protection because they have suffered persecution or fear that they will suffer persecution in their home country due to "race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A); *see also* U.S. Citizenship and Immigration Services, "Humanitarian – Asylum" *available at* https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last accessed Aug. 29, 2025).

3.    There are a few different manners in which individuals may apply for asylum. One such manner is to apply in the course of removal proceedings before an immigration judge through the filing Form I-589. *See* U.S. Citizenship and Immigration Services, I-589, *available at* https://www.uscis.gov/i-589 (last accessed August 31, 2025). It can be a lengthy process for the I-589 to be completed and for the immigration judge to conduct a full hearing to decide whether asylum will be granted. During that process, the applicant must continue to participate in hearings before the immigration judge. Failure to appear at immigration court hearings may result in abandonment of the asylum claim and the issuance of an *in absentia* order of removal. Some individuals may also be required to comply with requirements for check-ins with ICE or other forms of monitoring. ICE has the ability to require a person to come into an ICE office for a check-in at any time.

4.    This case arises because, beginning in May 2025, DHS officers began arresting individuals in the San Diego Immigration Court in the John Rhoades Federal Judicial Center. Many of those individuals are seeking asylum and are present at the San Diego Immigration Court for mandatory hearings before an immigration judge. DHS has already previously determined that these individuals need not be detained during those proceedings because they do not present a risk of flight or danger to the community. Nevertheless, and despite no intervening criminal arrests or convictions, DHS officers arrest these individuals in the hallway of the San Diego Immigration Court.

CLASS ACTION COMPLAINT

5.      Back in the fall of 2020, a temporary restraining order enjoined the Department of Homeland Security ("DHS") from conducting similar civil immigration arrests at the federal courthouse in San Diego, California. *See Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*, 500 F. Supp. 3d 1132 (S.D. Cal. 2020). The plaintiffs in that case challenged the federal government's "practice of using the federal courthouse as a preferred location to arrest noncitizens appearing for court hearings in order to place them in civil deportation proceedings." *Id.* at 1136. It was "undisputed that the courthouse arrests at issue are for civil immigration enforcement only (deportation) and not for arrest due to commission of a new crime, or to apprehend an individual who poses a danger to national security or a risk to public safety." *Id.* at 1137. The district court found that the practice "deters parties and witnesses from coming to court, instills fear, is inconsistent with the decorum of the court, and degrades the administration of justice." *Id.* The district court further held that "[t]he common-law rule against civil courthouse arrest is incorporated in the INA [Immigration and Nationality Act] and ensures that courts everywhere are open, accessible, free from interruption, and able to protect the rights of all who come before the court." *Id.* The district court thus concluded that "DHS's courthouse arrest policy violates these long-standing principles" and issued a temporary restraining order "prohibiting DHS officers' practice of conducting civil immigration arrests at the federal courthouse." *Id.*

6.      Plaintiffs bring this lawsuit to, similarly, protect those long-standing principles again in San Diego. Specifically, Plaintiffs here challenge the lawfulness of DHS's new practice of using the immigration court in San Diego—which is part of the same federal complex as the federal courthouse—as a preferred location to arrest noncitizens appearing for court hearings before an immigration judge. This new practice arose as a result of Defendants' unlawful policy changes, which are arbitrary and capricious, in excess of statutory authority, and are also unconstitutional. On information and belief, DHS lawyers follow new unlawful

4

CLASS ACTION COMPLAINT

policies to move to dismiss individual cases. They also notify DHS officers of which individuals' cases they intend to move to dismiss. Those DHS officers then obtain "warrants" for the civil immigration arrest of those individuals that they intend to execute after their hearings in the San Diego Immigration Court conclude—even though their cases have not yet been dismissed at the time the "warrants" are obtained.[1] They obtain these "warrants" in advance because those DHS officers know that new Executive Office for Immigration Review ("EOIR") policies directed at immigration judges will result in those motions being granted, even though the motions do not comply with notice requirements and response time requirements in the Immigration Practice Manual and binding regulations.

7.    As asylum-seekers with no criminal history who have been consistently attending immigration court proceedings while out of custody based on a determination that they do not pose a risk of danger or flight, Plaintiffs and the class of individuals they seek to represent suffered—and may again suffer—substantial harms that are a result of Defendants' unlawful changes in policy with respect to arrests of noncitizens at the San Diego Immigration Court.

8.    In this lawsuit, Plaintiffs challenge the overall policy of civil immigration arrests at the San Diego Immigration Court pursuant to new written policies: (1) Defendants' policies authorizing civil immigration arrests in immigration courts; and (2) Defendants' guidance instructing DHS prosecutors to bring motions to dismiss and parallel guidance instructing immigration judges to entertain and grant these motions without following required procedures. Individual Plaintiff seeks relief on behalf of himself and a class of similarly situated noncitizens with no criminal history who are seeking asylum.

---

[1] "Warrants" is written in quotation marks because these are not judicial warrants. Rather, the ICE officers obtain a Form I-200 Warrant for Arrest of Alien, which is signed by an "Authorized Immigration Officer" and commands any immigration officer "to arrest and take into custody" the named individual "for removal proceedings."

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

9. This case arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*.; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., and its implementing regulations; the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Because this suit seeks relief other than money damages and instead challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit under the APA. 5 U.S.C. § 702.

11. Venue is proper under 28 U.S.C. § 1391(e)(1) because several Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

**PARTIES**

**A.    Plaintiffs**

12. Plaintiff A.M. is a Sahrawi man who fears persecution by Moroccan authorities. He entered the United States on or around January 29, 2024, without inspection. Defendants released him on his own recognizance with a Notice to Appear before an immigration judge based on the determination that he is not a danger to the community nor a flight risk. Within one year of his entry into the United States, A.M. applied for asylum. At his hearing before an immigration judge on June 3, 2025, and without prior notice, DHS orally moved to dismiss his case. The immigration judge granted that motion. A.M. was arrested by ICE in the hallway of the immigration court in San Diego and was detained. He participated in a credible fear interview and received a positive result, which means that he is now back in removal proceedings before an immigration judge. However, that immigration judge will not consider A.M.'s previously filed asylum application. Rather, A.M. was required to file a new asylum application. At present, A.M. is out

of custody. DHS only recently lifted the requirement that A.M. wear an ankle monitor.

13.    Plaintiff C.L.V. is a Colombian man who fears persecution because of political activism. He entered the United States on November 23, 2024 without inspection, and he has no criminal history. Defendants released him with a Notice to Appear before an immigration judge based on the determination that he was not a danger to the community or a flight risk. Within one year of his entry into the United States, C.L.V. applied for asylum. At his hearing before an immigration judge on May 22, 2025, DHS orally moved to dismiss his case without notice, and the immigration judge granted that motion. C.L.V. was arrested by ICE in the hallway of the immigration court in San Diego and has been detained ever since. Although he participated in a credible fear interview, his attorney was later informed that it was invalid because the appeal of the dismissal of his proceedings before the immigration judge is still pending, so DHS believes it lacks jurisdiction to conduct a credible fear interview. At present, C.L.V. remains in custody at the Otay Mesa Detention Center.

**B.    Defendants**

14.    Defendant United States Department of Justice ("DOJ") is a cabinet-level agency of the federal government. Immigration Judges employed by DOJ conduct full removal proceedings, *see* INA § 240 (8 U.S.C. § 1229a), and review negative credible fear determinations as part of the expedited removal process, *see* INA § 235 (8 U.S.C. § 1225(b)(1)(B)(iii)(III)).

15.    Defendant Executive Office for Immigration Review ("EOIR") is the sub-agency within DOJ that houses the immigration courts and the BIA.

16.    Defendant Department of Homeland Security ("DHS") is a cabinet-level agency of the federal government. DHS and its components, including Immigration and Customs Enforcement ("ICE"), are the agencies principally charged with implementing and enforcing the immigration laws and policies of the

United States.

17.    Defendant ICE is the sub-agency within DHS responsible for carrying out immigration enforcement and detention in the interior of the United States and for representing DHS in proceedings before the immigration courts.

18.    Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity. In that capacity, Defendant Bondi is charged with overseeing the DOJ and EOIR.

19.    Defendant Sirce E. Owen is the Acting Director of EOIR. She is sued in her official capacity. In that capacity, Defendant Owen is responsible for setting policy as it pertains to EOIR and for overseeing the immigration courts.

20.    Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing the enforcement of the immigration laws and the implementation of enforcement policies at DHS.

21.    Defendant Todd Lyons is the Acting Director of ICE. He is sued in his official capacity. In that capacity, Defendant Lyons is responsible for the enforcement of the immigration laws in the interior of the United States, the implementation of enforcement policies, and oversight of the DHS lawyers who appear before the immigration courts.

22.    Jason Aguilar is the Chief Counsel for Immigration and Customs Enforcement San Diego. He is sued in his official capacity. In that capacity, Defendant Aguilar is responsible for providing legal representation and advice for ICE.

23.    Sidney Aki is the Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection. He is sued in his official capacity. In that capacity, Defendant Aki is responsible for overseeing ~2,700 employees assigned to the five land border ports of entry of San Ysidro, Otay Mesa, Tecate, Calexico, and Andrade, and also oversees the San Diego International airport, the San Diego

CLASS ACTION COMPLAINT

seaport, and other general aviation centers.

24.    Gregory J. Archambeault is the Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO), San Diego. He is sued in his official capacity. In that capacity, Defendant Archambeault is responsible for managing the San Diego ERO field office, including federal law enforcement officers, administrative staff, and two major immigration centers. ERO is responsible for identifying and arresting deportable individuals, detaining those individuals when necessary, and ultimately removing them from the United States.

25.    Plaintiff is currently unaware of the true names of the remaining defendants, Does 1-20 Does 1-20 were the agents or employees of the DOJ and/or DHS and acted within the scope of that agency or employment. Plaintiff will seek leave to amend this pleading if/when they discover the true names of these defendants.

26.    The true names and capacities of Defendants sued as Does 1 through 20, inclusive are presently unknown to Plaintiffs. Plaintiffs are informed and believes and thereon alleges that each Defendant is in some way responsible and liable for the events or happenings alleged in this Complaint. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

27.    Plaintiff further alleges that, in performing the acts and omissions alleged herein, and at all times mentioned herein, each Doe defendant was the agent and/or employee and/or alter ego of each of the other defendants and was at all times acting within the course and cope of such agency and/or employment and/or alter ego and with the prior knowledge and approval and subsequent ratification of each of the other defendants. Each reference herein to "Defendants" refers to all named defendants and to all Doe defendants, and each of them.

**STATEMENT OF FACTS**

I.    **The John Rhoades Federal Judicial Center in San Diego includes both the federal courthouse and the federal building where the San Diego Immigration Court is located.**

28.    The John Rhoades Federal Judicial Center ("FJC") in San Diego includes the federal property located at 221 West Broadway, 333 West Broadway, 880 Front Street, 325 West F Street, 808 Union Street, and the adjoining plaza. *See* Designation – John Rhoades Federal Judicial Center, Public Law 113-241, 128 Stat. 2858 (2014), *available at* https://www.congress.gov/113/statute/STATUTE-128/STATUTE-128-Pg2858.pdf (last accessed August 31, 2025).

29.    The newest building of the FJC is a sixteen-story federal courthouse called the James M. Carter and Judith N. Keep United States Courthouse, which is located at the 333 West Broadway address. There is also a six-story federal office building (at 880 Front Street) and a connected five-story federal courthouse (at 221 West Broadway), both of which are named for Edward J. Schwartz. *See* U.S. General Services Administration, "Edward J. Schwartz Federal Building and U.S. Courthouse," *available at* https://www.gsa.gov/about-us/gsa-regions/region-9-pacific-rim/buildings-and-facilities/california/edward-j-schwartz-federal-buildingus-courthouse (last accessed August 12, 2025).

30.    Individuals may walk between the Edward J. Schwartz federal building and the Edward J. Schwartz federal courthouse through an enclosed walkway.

31.    The website for San Diego's Immigration Court instructs visitors to access the immigration court through the Edward J. Schwartz Federal Building.

II.    **In the fall of 2020, a temporary restraining order prevented DHS officers from conducting civil immigration arrests at the federal courthouse in the FJC in San Diego.**

32.    DHS officers recently had a policy of conducting arrests at the federal courthouse in San Diego, California, from around 2018 to the fall of 2020. *See*

*Velazquez-Hernandez*, 500 F.Supp.3d at 1132. At the time, the federal government was charging individuals with misdemeanor illegal entry through "Operation Streamline." *Id.* at 1139. DHS could have lodged immigration detainers on individuals who were being prosecuted in this manner, but they did not. *Id.* at 1142. That meant that any individual who posted bond in their misdemeanor criminal case was released from custody. *Id.* DHS officers then attended nearly every court hearing for those individuals "in order to effectuate a civil courthouse arrest following the conclusion of the case." *Id.* at 1139 (quotations and citation omitted).

33.    Affected individuals challenged the federal government's "practice of using the federal courthouse as a preferred location to arrest noncitizens appearing for court hearings in order to place them in civil deportation proceedings." *Id.* at 1136.

34.    The district court held that "[t]he common-law rule against civil courthouse arrest is incorporated in the INA [Immigration and Nationality Act] and ensures that courts everywhere are open, accessible, free from interruption, and able to protect the rights of all who come before the court." *Id.* at 1137. Reasoning that "[t]he court is not an 'arrest pad' nor will it ever be," *id.* at 1146, the district court issued a temporary restraining order "prohibiting DHS officers' practice of conducting civil immigration arrests at the federal courthouse." *Id.* at 1137.

**III.    Historically, the Federal Government has not conducted civil immigration arrests at courthouses, including immigration courts.**

35.    The Federal Government has historically largely refrained from conducting civil immigration arrests at courthouses, including immigration courts, because conducting such arrests would deter noncitizens from attending proceedings and disrupt the proper functioning of courts.

36.    This years long practice was formalized in DHS guidance issued in 2021 and EOIR guidance issued in 2023.

37.    On April 27, 2021, a DHS Memorandum entitled "Civil Immigration

CLASS ACTION COMPLAINT

Enforcement Actions in or near Courthouses" was directed to ICE and U.S. Customs and Border Protection ("CBP"). *Civil Immigration Enforcement Actions in or near Courthouses* 1 (Apr. 27, 2021) ("2021 DHS Memorandum").[2] It began by explaining the "Core Principle" that the "courthouse is a place where the law is interpreted, applied, and justice is to be done." *Id.* It noted the "special responsibility" that law enforcement officers and public servants have "to ensure that access to the courthouse—and therefore access to justice, safety for crime victims, and equal protection under the law—is preserved." *Id.* It recognized that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." *Id.* at 1. Thus, DHS limited courthouse arrests "so as to not unnecessarily impinge upon the core principle of preserving access to justice." *Id.*

38.    The 2021 DHS Memorandum explicitly stated that "a courthouse includes any municipal, county, state, federal, tribal, or territorial courthouse, <u>including immigration courts</u>." *Id.* (emphasis added).

39.    The 2021 DHS Memorandum explained that DHS agents were only permitted to conduct civil immigration enforcement action in or near a courthouse in extremely limited circumstances: on the basis of (1) "a national security threat," (2) "an imminent risk of death, violence, or physical harm to any person," (3) the "hot pursuit of an individual who poses a threat to public safety," or (4) the "imminent risk of destruction of evidence material to a criminal case." *Id.*

40.    "In the absence of a hot pursuit," DHS personnel were permitted to

---

[2] Memorandum from Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on Civil Immigration Enforcement Actions in or near Courthouses to ICE & CBP (Apr. 27, 2021), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2021-Apr/Enforcement-Actions-in-Courthouses-04-26-21.pdf

CLASS ACTION COMPLAINT

1   make civil arrests "in or near a courthouse" only against "an individual who poses

2   a threat to public safety," and only if (1) it was "necessary to take the action in or

3   near the courthouse because a safe alternative location for such action does not exist

4   or would be too difficult to achieve the enforcement action at such a location," and

5   (2) "the action [was] approved in advance by a Field Office Director, Special Agent

6   in Charge, Chief Patrol Agent, or Port Director." *Id*. at 2.

7         41.   The 2021 DHS Memorandum also specified that any permitted civil

8   immigration enforcement action "will be taken in a non-public area of the

9   courthouse, outside of public view." *Id.* at 3.

10        42.   On December 11, 2023, EOIR issued Operating Policies and

11  Procedures Memorandum ("2023 EOIR OPPM") 23-01.[3] The stated purpose of the

12  2023 EOIR OPPM was "to provide updated guidance regarding enforcement

13  actions by the Department of Homeland Security ("DHS") in or near Office of the

14  Chief Immigration Judge ("OCIJ") space." *Id.* at 1. It specified that "OCIJ space"

15  includes "OCIJ offices, conference rooms, pro bono rooms, courtrooms, hallways,

16  waiting areas, restrooms, elevator banks, or any other space on any floor of a federal

17  or commercial building where OCIJ conducts business." *Id.* It defined the term

18  "enforcement action" to include "law enforcement activities carried out by DHS

19  personnel, including personnel from Immigration and Customs Enforcement

20  ("ICE") and Customs and Border Protection ("CBP")," to include "civil

21  apprehensions…, seizures, interviews, [] surveillance…[and] attendance at

22  immigration court hearings for the purpose of carrying out one of the actions

23  described above." *Id.* at 2.

24

25  [3] Memorandum from Sheily McNulty, Chief Immigration Judge, on Operating
    Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ
26  Space to All Assistant Chief Immigration Judges, Immigration Judges, Court
    Administrators, and Court Personnel (Dec. 11, 2023), *available at*
27  https://www.justice.gov/d9/2023-
28  12/oppm_re_dhs_enforcement_actions_in_or_near_ocij_space_-_12.11.2023.pdf.

CLASS ACTION COMPLAINT

43. The 2023 EOIR OPPM expressly "concurs with the policies outlined in the [2021] DHS Memorandum prohibiting DHS officials from carrying out enforcement actions in or near OCIJ space." *Id.* It stated four reasons for that concurrence: (1) "permitting enforcement action in or near OCIJ space would inevitably produce a 'chilling effect' on noncitizens who appear before our immigration courts," (2) "permitting enforcement actions in or near OCIJ space would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and  hinder the ability of OCIJ to carry out the mission of the agency," (3) "allowing enforcement actions to take place in or near OCIJ space may create safety risks for those who may be present during such enforcement actions, including children and adults appearing for hearings, OCIJ employees, and other building or facilities personnel," and (4) "prohibiting enforcement actions from occurring in or near OCIJ space helps to reinforce the separate and distinct roles of DHS and the Executive Office for Immigration Review ("EOIR") in the eyes of the public." *Id.*

44. The 2023 EOIR OPPM also recognized exceptions based on exigent circumstances, which mirrored those outlined in the 2021 DHS Memorandum: "(1) a threat to national security; (2) imminent risk of death, violence, or physical harm to any person; (3) hot pursuit of an individual who poses a public safety threat; (4) imminent risk that evidence material to a criminal case will be destroyed; and (5) instances in which a safe alternative location for the enforcement action does not exist." *Id.* at 2-3. It, like the 2023 DHS Memorandum, provided that, "to the fullest extent possible, enforcement actions taken in or near OCIJ space under these exigent circumstances should be conducted: (1) in a nonpublic area of OCIJ space, outside of public view." *Id.* at 3.

45. In summary, the 2023 EOIR OPPM adopted DHS's policy that, absent the exigent circumstances outlined by DHS, civil immigration enforcement actions could not be taken in or near an immigration court. *Id.* at 2-3.

**IV.    Defendants adopted new policies to arrest people appearing for hearings before Immigration Judges around the country, including in the San Diego Immigration Court.**

46.    DHS and EOIR abandoned the above policies intended to preserve the administration of justice in a series of documents issued between January and May 2025 (collectively, "the Courthouse Arrest Guidance").

47.    On January 20, 2025, then-acting DHS Secretary Benjamine Huffman directed DHS agencies to "rescind[] the Biden Administration's guidelines . . . that thwart law enforcement in or near so-called 'sensitive' areas." *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025).[4] This brief directive eliminated "bright line rules regarding where our immigration laws are permitted to be enforced." *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025).[5] It did not contain substantive reasoning or address the rationales that informed prior policy. *Id.*

48.    The next day, then-acting ICE Director Caleb Vitello issued interim guidance to ICE that superseded the 2021 DHS Memorandum. *See* Caleb Vitello, Acting Director, U.S. Immigration & Customs Enforcement, Policy Number 11072.3, *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (Jan. 2025 ICE Arrest Guidance).[6] The Jan. 2025 ICE Arrest Guidance

---

[4] Press Release, Homeland Security, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse Humanitarian Parole (Jan. 21, 2025), *available at* https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

[5] Memorandum from Benjamine C. Huffman, Acting Secretary, on Enforcement Actions in or Near Protected Areas to Caleb Vitello, Acting Director of ICE & Pete R. Flores, Senior Official Performing the Duties of the Comm'r of CBP (Jan. 20, 2025), *available at* https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

[6] Memorandum from Caleb Vitello, Acting Director of ICE on Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses to All ICE

instructed that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location, and where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *Id.* at 2.

49.    The Jan. 2025 ICE Arrest Guidance identified "targeted aliens" as "including but not limited to…[n]ational security or public safety threats; [s]pecific aliens with criminal convictions; [g]ang members; [a]liens who have been ordered removed from the United States but have failed to depart; and/or [a]liens who have re-entered the country illegally after being removed." *Id.*

50.    But the Jan. 2025 ICE Arrest Guidance also stated that "[o]ther aliens encountered during a civil enforcement action in or near a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, may be subject to civil enforcement action on a case-by-case basis considering the totality of the circumstances." *Id.* It did not specify what factors should be considered in making that case-by-case decision.

51.    The Jan. 2025 ICE Arrest Guidance still required that "civil enforcement actions in or near courthouses should, to the extent practicable, continue to take place in nonpublic areas of the courthouse," further directing that "ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings." *Id.* It also directed that "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court)." *Id.* at 3.

52.    The Jan. 2025 ICE Arrest Guidance stated that "when ICE engages in

---

Employees    (Jan.    21,    2025),    *available    at* https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActionsCourthouses_ 01.21.2025.pdf.

civil immigration enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officer and agents" given that people "entering courthouses are typically screened by law enforcement personnel to search for weapons and contraband." *Id.* at 1. It also stated that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE." *Id.* But it did not address the "core principle" identified in the 2021 DHS Memorandum that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." 2021 DHS Memorandum at 1.

53.    Defendant Sirce Owen, the Acting Director of EOIR, followed one week later with a memorandum rescinding 2023 EOIR OPPM. *See* Sirce E. Owen, Acting Director, EOIR, OPPM 25-06, *Cancellation of Operating Policies and Procedures Memorandum 23-01* (Jan. 28, 2025) ("2025 EOIR OPPM").[7] It stated that there was "no longer a basis" to main the 2023 EOIR OPPM because the 2021 DHS Memorandum had been rescinded and replaced by the Jan. 2025 ICE Arrest Guidance. *Id.* at 1.

54.    The 2025 EOIR OPPM dismissed the bases for the 2023 EOIR OPPM by stating, *inter alia*, that it had not "explain[ed] why, contrary to logic, aliens with valid claims to legal immigration status would be disincentivized from attending their hearings, even though they had no reason to fear any enforcement action by DHS." *Id.* at 1-2. It further asserted that "EOIR lacks the authority to prohibit DHS from conducting any action it is otherwise lawfully authorized to take." *Id.* at 2.

55.    Defendant Lyons issued a final version of the Jan. 2025 ICE Arrest Guidance on May 27, 2025. Todd M. Lyons, Acting Director, U.S. Immigration & Customs Enforcement, Policy Number 11072.4, *Civil Immigration Enforcement*

---

[7] Memorandum from Sirce E. Owen, Acting Director of EOIR on the Cancellation of Operating Policies and Procedures to All of EOIR (Jan. 28, 2025), *available at* https://www.justice.gov/eoir/media/1387301/dl?inline.

*Actions In or Near Courthouses* (May 27, 2025) ("May 2025 ICE Arrest Guidance").[8] It is nearly identical to the Jan. 2025 ICE Arrest Guidance, but it does not include the restriction against courthouse arrests if they would violate local law. *Id.* It states that "ICE officers and agents will make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* at 2.

**V.    Defendants instructed their DHS employees to seek, and the EOIR employees to grant, dismissal of removal proceedings before immigration judges without following the relevant procedural rules in the Immigration Practice Manual and binding regulations.**

56.    On information and belief, on or about May 20, 2025, DHS issued guidance regarding, among other things, the dismissal of full removal proceedings under INA § 240 (found at 8 U.S.C. § 1229a). ("DHS Dismissal Guidance"). On information and belief, the DHS Dismissal Guidance instructed DHS attorneys to dismiss § 240 removal proceedings before immigration judges and coordinate in advance with ICE officers so that those officers could then arrest the individuals whose cases had just been dismissed right outside the immigration court.

57.    About ten days later, EOIR leadership sent an email to immigration judges with the subject line "Guidance on Case Adjudication" that directly addressed motions to dismiss by DHS attorneys. *See* Am. Immigr. Laws. Ass'n, *Practice Alert: EOIR Guidance to Immigration Judges on Dismissals and Other Adjudications* (June 12, 2025), *available at* https://www.aila.org/practice-alert-eoir-guidance-to-immigration-judges-on-dismissals-and-other-adjudications    ("EOIR Case Adjudication Guidance"). It stated that "DHS Motions to Dismiss may be made orally and decided from the bench" without requiring "additional documentation or briefing. *Id.* It explicitly stated that a "10-day response period is

---

[8] Memorandum from Todd M. Lyons, Acting Director of ICE on Civil Immigration Enforcement Actions In or Near Courthouses to All ICE Employees (May 27, 2025), *available at* https://www.ice.gov/doclib/foia/policy/11072.4.pdf.

not required," even though the Immigration Court Practice Manual ("Practice Manual") mandates it. *Id.* It also highlighted "DHS Enforcement actions at or near EOIR facilities" and instructed all immigration judges to be familiar with 2025 EOIR OPPM. *Id.*

58.    The DOJ has stated that the "requirements and local orders contained in the Practice Manual are binding on all parties who appear before the immigration courts, unless the immigration judge directs otherwise in a particular case." Immigration Court Practice Manual at 3, Statement Signed by Chief Immigration Judge    Tracy    Short    (Nov.    13,    2020)    *available    at* https://www.justice.gov/eoir/foialibrary/icpm01122021/dl; *see also Cui v. Garland*, 13 F.4th 991, 998 (9th Cir. 2021) (noting Practice Manual is authorized under 8 C.F.R. §§ 1003.0(b)(1)(i), 1003.9(b)(1)); 8 C.F.R. § 1003.0(b)(1)(i) (granting EOIR Director authority to "issue operational instructions and policy…"); 8 C.F.R. § 1003.9(b)(1) (granting Chief Immigration Judge the same authority).

59.    Yet the EOIR Case Adjudication Guidance violates the rules in the Practice Manual. Specifically, the Practice Manual mandates that "filings must be submitted at least fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing" for "master calendar hearings involving unrepresented non-detained aliens. *See* Practice Manual §3.1(b)(1)(A) (allowing filings to "be made either in advance of the hearing or in open court during the hearing" if the party is not requesting a ruling at or prior to the hearing), *available at* https://www.justice.gov/eoir/reference-materials/ic. The Practice Manual then requires any response to be filed within ten days of the filing of the motion. *Id.* For unrepresented non-detained individuals who have an individual calendar hearing, "filings must be submitted at least thirty (30) days in advance of the hearing" and responses "must be filed within ten (10) days after the original filing with the immigration court. *Id.* at § 3.1(b)(2)(A). Represented non-detained individuals must also file documents thirty days in advance of an individual

calendar hearing, and responses due within ten days of the original filing. *Id.* at § 3.1(b)(2)(B).

60.    The EOIR Case Adjudication Guidance also violates EOIR regulations found in the Code of Federal Regulations. Those regulations address pre-decision motions, requiring that "motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction" unless otherwise permitted by the immigration judge in the case. 8 C.F.R. § 1003.23(a)

61.    When proceedings under INA § 240 are initiated by DHS filing a Notice to Appear with an immigration court, jurisdiction vests with that court. DHS may not unilaterally cancel the proceedings; it must instead seek dismissal from the immigration judge. 8 C.F.R. §§ 239.2(c), 1239.2(c). DHS may only move for dismissal "on the grounds set out under 8 CFR § 239.2(a)." *Id.* Immigration judges must consider arguments made in opposition to dismissal before deciding the motion. *Id.* § 1003.23(a).

62.    Relevant to Plaintiff and the class he seeks to represent who are all asylum-seekers, those regulations also state that "[f]ailure to appear for a scheduled immigration hearing without prior authorization may result in dismissal of the [asylum] application and the entry of an order of deportation or removal in absentia." 8 C.F.R. § 1208.10.

**VI.    In the San Diego Immigration Court, ICE officers arrive each day with a list of individuals whom they intend to arrest and, often, civil immigration warrants for those individuals that were obtained *before* their cases were dismissed.**

63.    In the San Diego Immigration Court, DHS attorneys began making oral motions to dismiss § 240 proceedings in May 2025, and the individuals in whose cases those motions were made were promptly detained by DHS officers. Most often, those arrests happened in the hallway directly outside the San Diego Immigration Court on the 4th floor of 880 Front Street, which is part of the FJC.

Those DHS officers had (and continue to have) a list of individuals whom they intend to arrest each day. On average, ten people appear on those lists each day, and an average of at least one person on the list per day is seeking asylum. For some of the individuals on the lists, the DHS officers produced a "Warrant for Arrest of Alien," Form I-200.

64.    Individual Plaintiff A.M. was arrested pursuant to an I-200 Warrant that indicated the determination that he was removable was based on "biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law"—but did *not* check off the box indicating "the pendency of ongoing removal proceedings against the subject. *Accord* U.S. Dep't of Homeland Security, Warrant for Arrest of Alien I-200 Form, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF.

65.    Individual Plaintiff C.L.V. was arrested pursuant to an I-200 Warrant that indicated the determination that he was removable was based on "the execution of a charging document to initiate removal proceedings against the subject" and "the failure to establish admissibility subsequent to deferred inspection"—but did *not* check off the box indicating "the pendency of ongoing removal proceedings against the subject. *Accord id.*

**VII.    Individuals who are seeking asylum in pending proceedings before an immigration judge suffer harm when their cases are abruptly dismissed and they are immediately arrested at the San Diego Immigration Court.**

66.    Defendants' actions have and will continue to cause irreparable harm

to Individual Plaintiff and the class of individuals that they seek to represent—asylum-seekers with no criminal history who are already in removal proceedings and have been permitted to remain out of custody while attending hearings before immigration judges in the San Diego Immigration Court based on the determination that they do not pose a risk of danger or flight.

67.    Being unexpectedly arrested and detained while complying with a legal process has caused Plaintiff serious harm. Individual Plaintiff A.M. is seeking asylum due to fear of persecution in their home country. The experience of being arrested and detained while obeying a legal requirement to attend a hearing at the San Diego Immigration Court was emotionally distressing, especially because it reminded Individual Plaintiff of traumatizing experiences that form the basis of their decision to seek asylum.

68.    Individual Plaintiffs were also held in an overcrowded space with very limited ability to communicate to anyone outside of the detention facilities. Plaintiff C.L.V. was transferred between detention centers twice, during which time he was in restraints on his hands and feet that caused significant discomfort given the length of time he was so restrained.

69.    On information and belief, many of the individuals who are arrested at the San Diego Immigration Court (including Individual Plaintiffs A.M. and C.L.V.) are placed in expedited removal proceedings. Any person in expedited removal proceedings who expresses an intent to apply for asylum receives a "credible fear interview" before an asylum officer employed by U.S. Citizenship and Immigration Services ("USCIS"). 8 U.S.C. § 1225(b)(1)(B). If there is a positive finding—meaning that the asylum officer finds that the person has a credible fear of persecution—then the person is placed back in removal proceedings before an immigration judge in immigration court. *See* 8 C.F.R. § 208.30(e)(5).[9]

_____

[9] If the asylum officer makes a negative finding—meaning that the officer finds no credible fear of persecution—then the noncitizen may request review before an

CLASS ACTION COMPLAINT

70.    That means for any individual with a credible fear of persecution in their home country will, eventually, end up in proceedings before an immigration judge in removal proceedings, where they will have the opportunity to apply for asylum. But under those circumstances, the individual must submit a new application for asylum—thereby starting a long process (that often takes well over a year) all over from the beginning. Individual Plaintiff A.M. is now back in proceedings before an immigration judge, but he was required to file a new asylum application. This requirement has re-set the clock for his ability to obtain a work permit. *See also* U.S. Citizenship and Immigration Services, "Humanitarian – Asylum" *available at* https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last accessed Aug. 31, 2025) ("You are generally eligible to apply for an EAD [Employment Authorization Document] when your asylum application has been pending for 180 days.").

71.    For Individual Plaintiffs and the class of individuals they seek to represent—all of whom are seeking asylum—the abrupt dismissal of removal proceedings before an immigration judge significantly disrupts the progress of their individual asylum application, even if they are ultimately able to submit a new asylum application at a later point. Among other harms, it delays the adjudication of their asylum application to begin the process again, it delays the time when they can petition for family members to join them, it may result in prolonged detention[10], and it may delay the date on which they are eligible to get a work permit.

---

immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1208.30. If the reviewing immigration judge finds that the person has a credible fear of persecution, they are placed in full removal proceedings before an immigration judge in immigration court. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1208.30. If, however, the judge affirms the asylum officer's "negative" finding, the person is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(i), (iii). There is no opportunity to seek review before the BIA or an Article III judge. *See* 8 U.S.C. § 1252(a)(2)(A), (e).

[10] The statute provides that a person placed in expedited removal proceedings

CLASS ACTION COMPLAINT

1

**CLASS ACTION ALLEGATIONS**

2       72.    Individual Plaintiffs bring this action under Federal Rule of Civil

3   Procedure 23(a) and (b)(2) on behalf of himself and a class of all other persons

4   similarly situated, as to all counts.

5       73.    Individual Plaintiffs seek to represent the following Proposed Class:

6               All persons not otherwise amenable to arrest who (1) are
                respondents seeking asylum in proceedings under section 240 of
7               the Immigration and Nationality Act ("INA") who were/are
                permitted to remain out of custody during those proceedings and
8               were/are required to personally appear in the San Diego
9               Immigration Court on or after January 1, 2025, and (2) were
                arrested, or are arrested in the future, by Defendants in a civil
10              immigration enforcement action at or near the San Diego
11              Immigration Court on the day of their hearing in a removal
12              proceeding pursuant to INA § 240.

13      **NUMEROSITY**

14      74.    The proposed class satisfies the numerosity requirement of Rule

15  23(a)(1) because the class is so numerous that joinder of all members is

16  impracticable. On information and belief, Defendants have subjected approximately

17  ten people per day since May 2025 to dismissals and courthouse arrests at the San

18  Diego Immigration Court and will continue to do so on a widescale basis until and

19  unless a court order prevents them from doing so.

20      **ASCERTAINABILITY**

21      75.    The proposed class is ascertainable.  The persons arrested or detained

22  are identified in Defendants' records identifying the arrests made at the San Diego

23  Immigration Court.  The people at risk of arrest are identifiable from Defendants'

24  records of those who have not yet been arrested but are scheduled for an

25  ─────────────────────

26  pursuant to INA § 235 shall be detained for the duration of the credible fear process
    as well as subsequent removal proceedings for a person who is found to have a
27  credible fear of persecution. 8 U.S.C. § 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV),
    (b)(2)(A). By contrast, a person who is placed directly in § 240 proceedings without
28  criminal history is not usually detained.

CLASS ACTION COMPLAINT

1 | immigration hearing and/or appear on the list of individuals Defendants plan to seek
2 | arrest after their hearing at the San Diego Immigration Court.

3 | **COMMONALITY**

4 | 76.    The proposed class satisfies the commonality requirement of Rule
5 | 23(a)(2) because their claims turn on common questions of law or fact that are
6 | capable of class-wide resolution. All class members are asylum seekers. No class
7 | member had or has violated a law of the United States since they were initially
8 | placed in INA § 240 proceedings and so were or are not amenable to arrest other
9 | than because of the unconstitutional policies at issue in this case. All appeared or
10 | are scheduled to appear for an immigration hearing in the San Diego Immigration
11 | Court for the purpose of complying with their legal duties in seeking asylum. For
12 | each class member, DHS moved or will move to dismiss their case without notice.
13 | Each class member was in fact arrested or will be subject to arrest. The arrests by
14 | policy were or are to be carried out in the John Rhoades Federal Judicial Center.
15 | Each class member was arrested or will be arrested pursuant to the same newly
16 | enacted federal policies. Each class member will lose not only their liberty, but the
17 | progress they had already made in the asylum process because of the arrest. In turn,
18 | for each class member, the questions of law include, but are not limited to, whether
19 | the challenged policies violate the APA, the INA, and/or the Due Process Clause,
20 | and other common questions of law with respect to asylum-seekers with no criminal
21 | history who are scheduled to attend hearings before an immigration judge at the San
22 | Diego Immigration Court since January 1, 2025.

23 | **TYPICALITY**

24 | 77.    The proposed class meets the typicality requirement of Rule 23(a)(3)
25 | because the claims of the representative Individual Plaintiffs are typical of the
26 | claims of the class. Each class member's claims arise from the same course of events
27 | (Defendants' adoption of the Challenged Policies), and each class member has
28 | experienced or will experience the same principal injuries (being arrested in the San

Diego Immigration Court after appearing at a hearing before an immigration judge pursuant to INA § 240).

## ADEQUACY

78.    The proposed class representatives meet the adequacy requirement of Rule 23(a)(4). The representative Individual Plaintiffs seek the same relief as the other members of the class—declaratory relief and vacatur of the unlawful polices. Individual Plaintiffs are committed to defending the rights of all proposed class members fairly and adequately. They are aware of their obligations as proposed class representative and are willing to dedicate time and effort to pursuing and representing the interests of the proposed class.

79.    The proposed class representatives are represented by Singleton Schreiber, LLP, a firm with attorneys who have experience in civil rights litigation, administrative law, class action lawsuits, and other complex cases in both state and federal court. The firm has also hired an experienced full-time immigration attorney, who will begin in that position in December 2025 and is already actively consulting on this case.

80.    The proposed class representatives and class counsel will fairly and adequately represent the class.

## RULE 23(B)(2) RELIEF

81.    The proposed class also satisfies the requirements of Rule 23(b)(2). Defendants have acted on grounds generally applicable to the class by enacting the challenged policies. Equitable relief is therefore appropriate with respect to the class as a whole.

# CLAIMS FOR RELIEF

## First Claim for Relief

**Defendants' Policies That Result In Arresting Individuals at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego Is Unlawful Agency Action in Excess of Statutory Jurisdiction, Authority, or Limitations**
**(APA - 5 U.S.C. § 706(2)(C))**
*Class Count Raised by All Plaintiffs against All Defendants*

82.     The foregoing allegations are repeated and realleged as if fully set forth here.

83.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitation." 5 U.S.C. § 706(2)(C).

84.     The common-law privilege against civil arrest for individuals appearing in court began in England. *See* 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768). In American common law, "it was recognized as well-established into the twentieth century." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1143 (citing *Stewart v. Ramsay*, 242 U.S. 128 (1916)). The Supreme Court of the United States has recognized that "the Federal circuit and district courts have consistently sustained the privilege." *Stewart*, 242 U.S. at 131.

85.     The "purpose and rationale" of the common-law privilege against civil courthouse arrests "apply to the statutory context in which Congress was legislating in 1952 when it enacted the INA," showing that "Congress intended to retain the common-law rule." *Velazquez-Hernandez*, 500 F.Supp.3d at 1144; *see also id.* at 1145 ("finding the INA incorporates the common-law privilege against civil courthouse arrest"); *id.* at 1141 (finding plaintiffs are likely to succeed on their claim that DHS's immigration arrests at the San Diego courthouse "violate the APA as agency action 'in excess of statutory jurisdiction, authority, or limitation.' 5 U.S.C. § 706(2)(C).").

86.    Defendants' policies have caused, and continue to cause, DHS lawyers to coordinate with ICE officers in order to civilly arrest individuals in the San Diego Immigration Court.

87.    The San Diego Immigration Court is part of the John Rhoades Federal Judicial Center, which is protected by the common-law privilege against civil courthouse arrests.

88.    For these and other reasons, Defendants' policies that result in arresting individuals at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego are in excess of statutory jurisdiction, authority, or limitation.

**Second Claim for Relief**
**Defendants' Policies That Result In Arresting Individuals at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego Is Unlawful Agency Action as Contrary to Constitutional Right, Power, Privilege, or Immunity**
**(APA - 5 U.S.C. § 706(2)(B))**
*Class Count Raised by All Plaintiffs against All Defendants*

89.    The foregoing allegations are repeated and realleged as if fully set forth here.

90.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

91.    DHS has authority to release individuals on bond, on conditional parole, or on orders of release on their own recognizance, *see* INA 236(a)(2)/8 U.S.C. § 1226(a)(2), which will only be granted if the individual does not pose a danger to the community and is likely to appear for future proceedings, *see* 8 C.F.R. 236.1(c)(8). "Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F.Supp.3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

92.    Individual Plaintiff and the class of individuals they seek to represent had all been released by DHS prior to their arrest in the San Diego Immigration Court, and there have been no changed circumstances with respect to their individual risk of flight or danger since that initial release decision.

93.    The Federal Government is constrained by Due Process requirements when making detention decisions for noncitizens. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."); *Zadvydas*, 533 U.S. at 690 (noting "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Fifth Amendment's Due Process] Clause protects" and applying those protections to civil detention decisions in immigration proceedings).

94.    Due Process requires, at minimum, notice and an opportunity to respond to government actions. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

95.    Pursuant to Defendants' policies, DHS agents and officers civilly arrest individuals in the San Diego Immigration Court who DHS has previously released, despite no changed circumstances with respect to their individual risk of flight or danger since the initial release decision and without an individualized consideration of the relevant factors governing detention or release under the INA, in violation of Due Process.

96.    For these and other reasons, Defendants' policies that lead to arresting individuals at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego are contrary to constitutional right, power, privilege, or immunity.

### Third Claim for Relief

**Defendants' Arresting Individuals at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego Violates Due Process (Fifth Amendment of the U.S. Constitution)**
*Class Count Raised by All Plaintiffs against All Defendants*

97.     The foregoing allegations are repeated and realleged as if fully set forth here.

98.     DHS has authority to release individuals on bond, on conditional parole, or on orders of release on their own recognizance, *see* INA 236(a)(2)/8 U.S.C. § 1226(a)(2), which will only be granted if the individual does not pose a danger to the community and is likely to appear for future proceedings, *see* 8 C.F.R. 236.1(c)(8). "Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia*, 280 F. Supp. 3d at 1176.

99.     Individual Plaintiffs and the class of individuals they seek to represent had all been released by DHS prior to their arrest at the San Diego Immigration Court, and there have been no changed circumstances with respect to their individual risk of flight or danger since the initial release decision.

100.    The Federal Government is constrained by Due Process requirements when making detention decisions for noncitizens. *See Hernandez*, 872 F.3d at 981 ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."); *Zadvydas*, 533 U.S. at 690 (noting "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Fifth Amendment's Due Process] Clause protects" and applying those protections to civil detention decisions in immigration proceedings).

101.    Due Process requires, at minimum, notice and an opportunity to respond to government actions. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

102.    Defendants have violated Plaintiffs' Due Process rights through DHS lawyers' coordination with ICE officers in order to civilly arrest individuals in the

CLASS ACTION COMPLAINT

San Diego Immigration Court who have previously been released on bond for their removal proceedings, despite no changed circumstances with respect to their individual risk of flight or danger since the initial release decision and without an individualized consideration of the relevant factors governing detention or release under the INA.

## **Fourth Claim for Relief**

**EOIR Policy Permitting Courthouse Arrests is Arbitrary and Capricious (APA - 5 U.S.C. § 706(2)(A))**
***Class Count Raised by All Plaintiffs against all DOJ Defendants***

103.   The foregoing allegations are repeated and realleged as if fully set forth here.

104.   The DOJ Defendants had longstanding practices against allowing DHS to make arrests or take enforcement actions in immigration courts except in limited circumstances not present here. Most recently, this policy was codified in the 2023 EOIR OPPM (OPPM 23-01), which was rescinded by the 2025 EOIR OPPM (OPPM 25-06).

105.   The 2025 EOIR OPPM is arbitrary and capricious. It, *inter alia*, offers explanations that run counter to the evidence before the agency, entirely fails to consider important aspects of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, and includes reasoning that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

106.   The 2025 EOIR OPPM likewise ignores the "serious reliance interests" that noncitizens, their loved ones, and witnesses have with respect to prior longstanding policies that prohibited arrests at immigration courts except in limited circumstances. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020).

107.   For these and other reasons, the 2025 EOIR OPPM is arbitrary and

CLASS ACTION COMPLAINT

capricious.

## **Fifth Claim for Relief**

### **ICE Policies Authorizing Courthouse Arrests Are Arbitrary and Capricious (APA - 5 U.S.C. § 706(2)(A))**
*Class Count Raised by All Plaintiffs against all DHS Defendants*

108.   The foregoing allegations are repeated and realleged as if fully set forth here.

109.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

110.   DHS, including ICE, had longstanding policies against taking enforcement actions in immigration courts except in circumstances not present here. The Jan. 2025 ICE Arrest Guidance and the May 2025 ICE Arrest Guidance reversed that policy.

111.   Both the Jan. 2025 ICE Arrest Guidance and the May 2025 ICE Arrest Guidance are arbitrary and capricious. They both, *inter alia*, offer explanations that run counter to the evidence before the agency, entirely fail to consider important aspects of the problem, offer an explanation for its decision that runs counter to the evidence before the agency, and include reasoning that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See State Farm*, 463 U.S. at 43.

112.   The Jan. 2025 ICE Arrest Guidance and the May 2025 ICE Arrest Guidance likewise ignore the "serious reliance interests" that noncitizens, their loved ones, and witnesses have with respect to prior longstanding policies that prohibited arrests at immigration courts except in limited circumstances. *See Regents*, 591 U.S. at 30.

113.   For these and other reasons, Jan. 2025 ICE Arrest Guidance and the May 2025 ICE Arrest Guidance are arbitrary and capricious.

CLASS ACTION COMPLAINT

## Sixth Claim for Relief

**EOIR Case Adjudication Guidance is Arbitrary and Capricious**
**(APA - 5 U.S.C. § 706(2)(A))**
***Class Count Raised by All Plaintiffs against all DOJ Defendants***

114.    The foregoing allegations are repeated and realleged as if fully set forth here.

115.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

116.    The Immigration Court Practice Manual instructs parties to file motions in advance of a hearing and allows the nonmoving party an opportunity to respond. *See* ICPM § 3.1(b)(1)(A)- (B). These rules, which EOIR generally treats as binding, confer significant procedural protections and benefits on individuals in removal proceedings, who often are unrepresented by counsel and have little personal knowledge of U.S. immigration law.

117.    The EOIR Case Adjudication Guidance exempts DHS trial attorneys from the requirement of filing motions in advance when seeking dismissal of removal proceedings under 8 U.S.C. § 1229a. The EOIR Case Adjudication Guidance likewise instructs IJs that they need not provide the individual with an opportunity to respond.

118.    The EOIR Case Adjudication Guidance is arbitrary and capricious because, *inter alia*, fails to consider important aspects of the problem and includes reasoning that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. It also does not satisfy the agency's duty to provide a reasoned explanation for its change in policy, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); and overlooks significant reliance interests, *see Regents*, 591 U.S. at 30.

119.    The EOIR Case Adjudication Guidance also violates the APA by

CLASS ACTION COMPLAINT

creating a one-sided categorical exception to the agency's own binding procedures. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

120.   For these and other reasons, the EOIR Case Adjudication Guidance is arbitrary and capricious.

### Seventh Claim for Relief

**DHS Dismissal Guidance is Arbitrary and Capricious**
**(APA - 5 U.S.C. § 706(2)(A))**
***Class Count Raised by All Plaintiffs against all DHS Defendants***

121.   The foregoing allegations are repeated and realleged as if fully set forth here.

122.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

123.   On information and belief, DHS issued guidance on or around May 20, 2025, that instructed DHS attorneys to move to dismiss full removal proceedings in order to facilitate courthouse arrests and the transfer of people from full removal proceedings to expedited removal.

124.   On information and belief, the DHS Dismissal Guidance is arbitrary and capricious because, *inter alia*, it does not satisfy the agency's duty to provide a reasoned explanation for its change in policy, *Encino Motorcars*, 579 U.S. at 221; fails to consider important aspects of the problem, *State Farm*, 463 U.S. at 43; and overlooks significant reliance interests, *see Regents*, 591 U.S. at 30.

125.   For these and other reasons, the DHS Dismissal Guidance is arbitrary and capricious.

CLASS ACTION COMPLAINT

## Eighth Claim for Relief

**EOIR Case Adjudication Guidance and DHS Dismissal Guidance Violate the
Due Process Clause of the Fifth Amendment
(APA - 5 U.S.C. § 706(2)(B))**
*Class Count Raised by All Plaintiffs against all DOJ Defendants*

126.    The foregoing allegations are repeated and realleged as if fully set forth here.

127.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

128.    The EOIR Case Adjudication Guidance and DHS Dismissal Guidance authorize and encourage the dismissal of proceedings without providing affected individuals with timely notice or a meaningful opportunity to be heard. The resulting dismissals strip the individuals of critical rights and procedural protections that are available in removal proceedings before immigration judges in immigration court pursuant to INA § 240/8 U.S.C. § 1229a.

129.    The due process clause extends to all people, regardless of their citizenship status. *Zadvydas*, 533 U.S. at 693. And at its most basic level, it offers notice and an opportunity to respond to government actions. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

130.    Because the EOIR Case Adjudication Guidance and DHS Dismissal Guidance violate a protected liberty interest and deprive individuals of a meaningful opportunity to be heard, they violate the Due Process clause of the Constitution.

### PRAYER FOR RELIEF

Plaintiffs request that the Court grant the following relief:

a.  Certify this case as a class action;

b.  Appoint Individual Plaintiffs A.M. and C.L.V. as representatives of the class;

c.  Exercise the Court's authority under 5 U.S.C. §705 to provide interim relief pending review of all policies leading to Defendants' arresting individuals at

the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego;

d. Exercise the Court's authority under 5 U.S.C. §706 to set aside Defendants' policy and practice of arresting class members at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego;

e. Declare that arresting class members at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego is unlawful agency action in excess of statutory jurisdiction, authority, or limitations.

f. Declare that arresting class members at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego is unlawful agency action contrary to Constitutional right, power, privilege, or immunity.

g. Declare that arresting class members at the San Diego Immigration Court in the John Rhoades Federal Judicial Center in San Diego violates Due Process.

h. Declare that EOIR OPPM 25-06, *Cancellation of Operating Policies and Procedures Memorandum 23-01* (Jan. 28, 2025), is arbitrary and capricious, in excess of statutory jurisdiction, authority, or limitations, and/or contrary to Constitutional right, power, privilege, or immunity.

i. Vacate EOIR OPPM 25-06, *Cancellation of Operating Policies and Procedures Memorandum 23-01* (Jan. 28, 2025).

j. Declare that U.S. Immigration & Customs Enforcement, Policy Number 11072.3, *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (Jan. 2025 ICE Arrest Guidance) and U.S. Immigration & Customs Enforcement, Policy Number 11072.4, *Civil Immigration Enforcement Actions In or Near Courthouses* (May 27, 2025), are arbitrary and capricious, in excess of statutory jurisdiction, authority, or limitations, and/or contrary to Constitutional right, power, privilege, or immunity.

k. Vacate U.S. Immigration & Customs Enforcement, Policy Number 11072.3, *Interim Guidance: Civil Immigration Enforcement Actions in or near*

CLASS ACTION COMPLAINT

1  *Courthouses* (Jan. 2025 ICE Arrest Guidance) and U.S. Immigration &
2  Customs Enforcement, Policy Number 11072.4, *Civil Immigration*
3  *Enforcement Actions In or Near Courthouses* (May 27, 2025).

4  l.  Award costs and/or attorney fees pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504,
5      and on any other basis justified under law; and

6  m. Grant any other and further relief that this Court deems just and appropriate,
7      including individual injunctions when requested as necessary to secure the
8      rights of class members.

10 DATED: September 4, 2025              Respectfully submitted,

11                                       SINGLETON SCHREIBER, LLP

12                                       */s/ Kimberly S. Hutchison*
13                                       Kimberly S. Hutchison
                                         *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT